IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:16-cv-00628-RJC
(3:14-cr-00082-RJC-5)

| | |
|---|---|
| MARGARET HARRIS, ) | |
| Petitioner, ) | |
| v. ) | **ORDER** |
| UNITED STATES OF AMERICA, ) | |
| Respondent. ) | |

**THIS MATTER** is before the Court on consideration of Petitioner's pro se Motion to Vacate, Set Aside or Correct Sentence which is filed pursuant to 28 U.S.C. § 2255. For the reasons that follow, Petitioner's § 2255 Motion to Vacate will be denied and dismissed.

I. BACKGROUND

On April 9, 2015, Petitioner pleaded guilty pursuant to a written plea agreement to one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1349 and 2326(2)(A) & (B) (Count One); one count of wire fraud and aiding and abetting the same, in violation of 18 U.S.C. §§ 1349, 2326(2)(A) & (B) and 2 (Count Two); and one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count Twelve). (3:14-cr-00082, Doc. No. 17: Superseding Indictment; Doc. No. 35: Plea Agreement; Doc. No. 38: Acceptance and Entry of Guilty Plea).

In Petitioner's presentence report (PSR), the probation officer included the complete Factual Basis that was filed contemporaneously with her plea agreement.

> 5. Beginning in or about July 2008 and continuing through September of 2014, the defendant, **MARGARET HARRIS (HARRIS),** participated in

1

sweepstakes telemarketing call centers located in Costa Rica for the purpose of defrauding U.S. residents by convincing them to pay money in an effort to claim a fictitious sweepstakes prize. At various points throughout the time of the offense, **HARRIS** worked in these call centers as an "opener" or a "loader." **HARRIS** further represents that during the entire period she was in Costa Rica, she suffered from extreme drug addiction, worked in the call centers when she was physically and mentally able, and desperately needed money.

6. As used in this Factual Basis, the following terms indicate the following:

   a. A "call center" is a business that engages in an illegal telemarketing scheme.

   b. An "opener" is an employee of a call center who makes the initial telephone contact with a prospective victim.

   c. An "opening" is the initial telephone pitch made to a victim to convince him/her to send money in order to claim a sweepstakes prize.

   d. A "loader" refers to the call center employee who takes over the victim contact after the victim has sent funds as a result of the pitch given by the opener. The loader, who is usually a more experienced telemarketer than the opener, attempts to convince the victim to send additional funds for various fees required to receive the represented prize.

   e. A "reload" is a pitch to a victim who previously sent funds to retrieve a sweepstakes prize.

   f. A "runner" is an individual who retrieves victim funds at a Western Union or Money Gram location and, for a fee, delivers them to the owner of a call center.

7. The ongoing investigation has revealed that since 2008 **HARRIS**, and co-conspirators have, in furtherance of the fraud, telephoned numerous U.S. residents from Costa Rica. **HARRIS** defrauded many elderly U.S. victims. The deception often began with a phone call from an opener in which a victim is informed that he or she has won second prize in a lottery or sweepstakes in the amount of $350,000 to $450,000. **HARRIS** and her coconspirators would inform their victims during the initial call that, in order to receive their prize money, the victims must pay a purported "refundable insurance fee."
**HARRIS** told victims to pay their fees via Western Union or Money Gram to individuals in Costa Rica. **HARRIS** and her co-conspirators kept the victims'

2

funds and never provided any "winnings" to the victims. The victims' funds were used to continue the operation of the call centers and for **HARRIS'** and her co-conspirators personal benefit.

8.      Once a victim made an initial payment for the purported insurance fees **HARRIS** and her co-conspirators continued to call the victims as loaders often falsely representing that a mistake had been made and that the victim had actually won first prize in excess of three million dollars. **HARRIS** and her co-conspirators told victims that they had to first pay thousands of additional dollars for increased insurance fees and other costs to claim their larger prizes. This practice is called "reloading" and **HARRIS** along with her coconspirators would continue to reload the victim as long as the victim was willing and able to continue to transfer funds. Many victims lost tens of thousands of dollars.

9.      During their solicitations, **HARRIS** and her co-conspirators often falsely represented themselves to be employees of U.S. government agencies such as, the Federal Trade Commission, the Department of Commerce, the Internal Revenue Service, and/or the Federal Bureau of Investigation. The defendant reserves the right to object to this factual representation.

10.     For prize verification, **HARRIS** and her co-conspirators gave victims telephone numbers that, although bearing U.S. area codes, were actually answered at the call centers in Costa Rica. This deceit was achieved through the use of Voice over Internet Protocol (VoIP) technology, which allowed telephone calls to be made over the Internet with chosen area codes not actually associated with physical locations in the United States. VoIP service providers allow subscribers to choose an area code that does not correspond to the subscriber's actual physical location. **HARRIS** and her coconspirators chose and utilized area code (202) to make their calls appear to be coming from the Washington, D.C. area as if the calls were actually being generated by federal agencies.

11.     **HARRIS** and her co-conspirators instructed victims to send their funds to Costa Rica via Western Union wire transfers. All Western Union wire transfers are electronically routed to and processed in and through Charlotte, North Carolina prior to being sent to their ultimate destination in Costa Rica.

12.     **HARRIS** knew that every factual assertion in their pitch to the victims was false including the representation that the telemarketers were calling from a federal governmental agency in the United States or that she represented herself to be an employee of the United States government. The defendant reserves the right to object to this factual representation.

13.     **HARRIS** represents that she suffered from a drug addiction while she was working as a telemarketer during the years charged in the Indictment which

3

> directly impacted her ability to work steadily at the call center(s) and her ability to convince victims to send money.
>
> 14. The government represents that, **HARRIS** and her co-conspirators, from Costa Rica, defrauded in excess of fifty (50) victims located in the United States of at least **$3,756,762.36** of their funds during the term of the conspiracy and many of the victims were over the age of 55 and vulnerable. The defendant reserves the right to object to all representations in this paragraph.
>
> 15. The government represents that on or about the dates set forth in the Indictment, **HARRIS** and her co-conspirators caused the victims identified in counts 2 through 11 and 13 through 21 to send Western Union transfers in the identified amounts from within the United States to San Jose, Costa Rica to pay for alleged fees required to claim their purported sweepstakes prizes in furtherance of the Wire Fraud and Money Laundering conspiracies. The defendant admits to the criminal activity charged in counts 1, 2 and 12 and reserves the right to contest her participation in the additional counts.

(Id., Doc. No. 36: Factual Basis; Doc. No. 45: PSR) (bold in original).

The probation officer calculated a total offense level of 32, and with a criminal history category of I, Petitioner's Guidelines range was 121 to 151 months in prison. During sentencing, the Court sustained Petitioner's objection to the loss amount which reduced her offense level to 30 yielding an adjusted range of 97-121-months' imprisonment. The Court also granted the Government's motion for a downward departure pursuant to § 5K1.1 of the U.S. Sentencing Guidelines Manual (USSG), and Petitioner was sentenced to a below-Guidelines range of 84 months in prison and she did not appeal. (Id., Doc. No. 66: Judgment; Doc. No. 67: Statement of Reasons at 4).

II. STANDARD OF REVIEW

Pursuant to Rule 4(b) of the Rules Governing Section 2255 Proceedings, sentencing courts are directed to promptly examine motions to vacate, along with "any attached exhibits and the record of prior proceedings" in order to determine whether a petitioner is entitled to any relief. The Court has considered the record in this matter and applicable authority and concludes

4

that this matter can be resolved without an evidentiary hearing. See Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970).

III.  DISCUSSION

In this collateral proceeding, Petitioner contends that she is entitled to sentencing relief based on Amendment 794 to USSG § 3B1.1 because she played a minor role in the offense of conviction. (3:16-cv-00628, Doc. No. 1: Motion to Vacate at 4-5). Section 3B1.1 provides for the application of a sentencing enhancement if the court finds that the defendant played an <u>aggravating</u> role in the offense of conviction. Neither the presentence report nor this Court found such an enhancement applicable. It appears that Petitioner is actually asserting that she should have received a minor role reduction under the provisions of Amendment 794 of § USSG 3B1.2.

Amendment 794 amended the commentary to § 3B1.2 to address what the Commission considered was an inconsistent application of the mitigating role reduction for low level offenders. In particular, the amendment added a non-exhaustive list for the court to consider when determining whether to apply the guideline and to what extent. See USSG § 3B1.2 cmt. n.3(C) (2015).

The Commission made the amendment effective for defendants sentenced on or after November 1, 2015. Petitioner was sentenced on October 27, 2015. Consequently, Amendment 794 would not have been applicable to the calculation of her advisory Guideline range. Nevertheless, the Court observes that Petitioner did in fact receive a two-level reduction under USSG § 3B1.2(b) after the Court found that she played a minor role in the offense conduct for which she was found guilty. (3:14-cr-00082, Doc. No. 35: PSR ¶ 35; Doc. No. 67: Statement of Reasons).

IV.　CONCLUSION

For the reasons stated herein, the Court finds that Petitioner's § 2255 Motion to Vacate is without merit and it will be dismissed.

**IT IS, THEREFORE, ORDERED** that Petitioner's Motion to Vacate is **DENIED** and **DISMISSED WITH PREJUDICE**. (Doc. No. 1).

**IT IS FURTHER ORDERED** that pursuant to Rule 11(a) of the Rules Governing Section 2255 Cases, the Court declines to issue a certificate of appealability as Petitioner has not made a substantial showing of a denial of a constitutional right. 28 U.S.C. § 2253(c)(2); Miller-El v. Cockrell, 537 U.S. 322, 336-38 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); Slack v. McDaniel, 529 U.S. 474, 484 (2000) (holding that when relief is denied on procedural grounds, a petitioner must establish both that the correctness of the dispositive procedural ruling is debatable, and that the petition states a debatably valid claim of the denial of a constitutional right).

The Clerk is directed to close this civil case.

**SO ORDERED**.

Signed: October 13, 2016

Robert J. Conrad, Jr.
United States District Judge